**NOT FOR PUBLICATION**

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| In Re:<br><br>Robert Bruce Doble, III,<br><br>Debtor. | Case No.: 13-22909-ABA<br><br>Chapter: 13<br><br>Judge: Andrew B. Altenburg, Jr. |

## OPINION

This matter came before the court on a Motion for Sanctions (the "Motion") filed with the Court on June 26, 2014 by Robert Bruce Doble, III (the "Debtor"), by and through his counsel, Kasen & Kasen, against New Jersey Housing and Mortgage Finance Agency and Cenlar FSB, Servicer and Subservicer respectively (individually/collectively, the "Servicer" or "Servicers"), and Servicers, by and through their counsel, Pluese, Becker & Saltzman LLC, having filed a response to the Motion on September 8, 2014, and the Debtor filed a Supplemental Certification in Support of Debtor's Motion for Sanctions on September 10, 2014. A hearing was held on September 16, 2014 at which the parties argued their positions ("September 16th Hearing").

The Debtor contends that Servicers acted in bad faith by partaking in the court's Loss Mitigation Program ("LMP") even though they knew that the Debtor, due to his pending bankruptcy case, was ineligible for the type of loss mitigation he desired. The Debtor alleges that because the desired loan modification was impossible, Servicers' conduct is sanctionable because Servicers caused him to expend time and money pursuing a strategy that he believes Servicers knew would be futile.[1] Servicers counter that while the Debtor's particular type of loan could not be modified as desired by the Debtor, other loss mitigation options were available to the Debtor. Servicers therefore argue that they did not act in bad faith by participating in the LMP despite the fact that one form of loss mitigation the Debtor desired was not available.

The following constitutes the court's findings of facts and conclusions of law.

### Findings of Fact

In 2007 the Debtor contracted for a loan evidenced by a note and secured by a mortgage subject to applicable regulations of the US Department of Agriculture (the "USDA") and encumbering property owned by the Debtor and located at 43 Fordham Road, Pennsville, NJ, 08070 (the "Property"). When the Debtor defaulted under the note and mortgage ultimately, foreclosure proceedings were instituted. Before a responsive pleading could be filed in the

---

[1] The Debtor also suggested that Cenlar discriminated against him by denying him loss mitigation solely on the basis he is in bankruptcy. The Court offered counsel to the Debtor the opportunity to brief this discrimination argument but counsel declined to do so.

foreclosure action, the Debtor's chapter 13 Petition and Plan were filed. The Debtor's Chapter 13 Plan proposed to cure pre-Petition mortgage arrears. At the time the Debtor filed for bankruptcy protection, he was approximately 44 payments and more than $68,000.00 in arrears under the note and mortgage. On April 5, 2014, the Debtor filed a motion to enter the Court's LMP. Through the LMP, the Debtor sought a loan modification that deferred or would balloon his pre-Petition arrears until the end of the loan.

On April 9, 2014, Servicers acquiesced to entering into the LMP and contact with the loss mitigation department was established and the usual documents were requested and submitted. On April 15, 2014, the Debtor uploaded the first batch of documents onto the LMP portal and on April 28, 2014, Cenlar emailed the Debtor asking him to submit two paystubs and a signed and dated hardship letter, which the Debtor subsequently submitted. On April 29, 2014, Servicers emailed the Debtor requesting a copy of the Debtor's 2013 W2 form, which the Debtor also submitted. After confirming with the Debtor that all of the Debtor's documents were filed, on or around June 9, 2014, Servicers sent the Debtor a denial letter stating that the fact that the Debtor was in bankruptcy prevented Servicers from providing the Debtor with the type of loan modification requested. The USDA Loss Mitigation Guide (the "USDA Guide"), provides that in order for a "loan to be considered for loss mitigation actions" the borrower "[m]ust not have a pending bankruptcy petition." *USDA Loss Mitigation Guide* at 3-A-2. *See,* Documents 48, Exhibit E and 49, Exhibit I on the Court's Docket. Counsel for the Servicers stated at the September 16th Hearing that the Servicers informed the Debtor of the determination as soon as it "figured . . . out" that the Debtor was not eligible for a loan modification. The Debtor filed the Motion in response to the Servicers' letter.

Debtor contends that Servicers should have known the Debtor's desired option of ballooning the pre-Petition arrears because it was stated in his motion to enter into the LMP and in at least in one spot in the packet of papers that he submitted to Servicers. Indeed, in Paragraph 22 of his motion to enter into the LMP, the Debtor states that he wishes to enter into the LMP: "so that he can negotiate a deal where either all or a portion of the mortgage arrears are put on the back end of his loan obligation." *See,* Document 30 on the Court's Docket, ¶22. The Debtor contends that the Servicers' knowledge of the Debtor's desire to enter into a specific loan modification and their failure to advise him of the restriction put in place by the USDA which would have made that option impossible and the Servicers' subsequent request for more documentation forms the basis of the Debtor's bad faith argument. It should be noted, however, that even counsel to the Debtor conceded at the September 16th Hearing that while the Debtor would have preferred to defer his arrears to the end of the loan term, he remained open to any course of action that would allow him to remain in his home.

At the September 16th Hearing, the Servicers suggested that had they construed Debtor's statement that he sought to "negotiate a deal where either all or a portion of the mortgage arrears are put on the back end of his loan obligation," as limiting the Debtor's interest in LMP participation to a loan modification and indicating that any other mitigating action would have been a waste of the Debtor's time and money, they would have been accused of "prejudging" the process and not adequately investigating the Debtor's options. Thus, they argue the Debtor should have made clear that he would only accept deferred treatment of the arrears when the Servicers originally informed him that it had no objection to participating in the LMP. Counsel

to the Servicers also countered, and a representative of Cenlar certified, that while the USDA guidelines prevented Servicers from deferring the Debtor's arrears until the end of the loan term, the Debtor had other consensual loss mitigation options available to him. Thus, Servicers did not act in bad faith by requesting additional documents through the LMP, as those documents were necessary to explore those non-loan modification options. In fact, Servicers stated, and the Debtor has not contested, that both liquidation and repayment options were available to the Debtor including deed in lieu of foreclosure, relocation assistance, short payoff, and short refinance. Servicers also asserted that a short-term repayment or forbearance agreement were considered but the Debtor's arrears were too large for that form of loss mitigation.[2] *See,* Document 48-1 on the Court's Docket, ¶8-10.

## Conclusions of Law

The United States Bankruptcy Court, District of New Jersey Loss Mitigation Programs and Procedures manual permits sanctions when a party fails to negotiate in good faith. Loss Mitigation Programs and Procedures, Section VII.A. These sanctions are applied via 11 U.S.C. § 105. *See, e.g., In re Furino,* Case No. 12-29799 (CMG), 2014 WL 789116, at *1, *3 (Bankr. D.N.J. Feb. 27, 2014); *In re Bambi,* 492 B.R. 183, 190-91 (Bankr. S.D.N.Y. 2013).

In *Furino,* the court applied sanctions under 11 U.S.C. § 105 and Federal Rules of Bankruptcy Procedure Rules 7016 and 9029(b) in the face of a mortgage holder's "lack of responsiveness and failure to appear at status conferences [which] violate[d] its duty to participate in the LMP in good faith." *Furino,* 2014 WL 789116, at *1, *3. In that case, the mortgage holder did not send counsel or a personal representative, as required by the court, to a settlement conference; failed to send a personal representative with settlement authority to a status conference, as required by the LMP; and failed to send a personal representative to a status conference, as required by the court. *Id.* at *1-*2. In addition, the court "extended the loss mitigation period numerous times," rescheduled a status conference six times, and held "at least one telephone conference" during which the mortgage holder agreed to provide certain information which it never provided. *Id.* at *3. Finally, one status conference "was delayed while the Court waited for [mortgage holder's] attorney to contact his client and instruct his client to participate by telephone." *Id.* In total, the mortgage holder's actions caused over a year of delays between the request for loss mitigation and an offer from the mortgage holder. *Id.* As such, sanctions were warranted.

In *Bambi,* 492 B.R. 183, the court applied sanctions in a case under its jurisdiction's Loss Mitigation Program under 11 U.S.C. § 105 and the court's "inherent powers" to control cases before it. *Id.* at 190-91. In that case, Hudson City Savings Bank ("Hudson City") misled the debtors by making them believe modification was an option. *Id.* at 190. That court cited a pattern of bad behavior including the fact that Hudson City "through its agent and servicer . . . solicited documents from the [d]ebtors, filed status letters, and appeared at status hearings for almost eight months before finally informing the [d]ebtors and the Court that Hudson City did

---

[2] Counsel to Servicers reiterated this point at the September 16th Hearing.

not modify loans." *Id.* at 189. The court concluded that "[i]nstead of volleying with the [d]ebtors for documents for several months Hudson City should have opposed the [d]ebtors' Loss Mitigation Request or otherwise informed the [d]ebtors and Court of this policy" at the start. *Id.* The court continued:

> Had Hudson City simply stated at the outset of these proceedings that it did not modify mortgages and provided relevant guidelines, there is little doubt that the Loss Mitigation process would have been terminated. Instead, Hudson City chose to "move the goalpost" at every opportunity-stringing the [d]ebtors and the Court along through a costly and drawn out process by failing to inform the Court and other parties about its modification policy, failing to provide investment guidelines as required by Court order, failing to obtain an appraisal of [d]ebtors' property in a timely fashion, failing to provide written terms of the modification placed on the record of the February 27, 2013 hearing, and failing to appear at the April 9, 2012 hearing after being ordered to do so. Such delay tactics caused these [d]ebtors monetary damages for having to pay their attorney to appear at each status conference, having to provide new documents when requested, and having to obtain an appraisal at their own expense.

*Id.* at 190. Hudson City's conduct resulted in over a year and a half of delays from the time the debtor requested loss mitigation to the time of the court's opinion when Hudson City had still not made a permanent modification offer. *Id.* The court concluded that "while these acts individually may not rise to the level of bad faith, together they show a pattern of evasive delay tactics" such that sanctions were appropriate. *Id.*

Here, the conduct the Debtor has alleged is much less egregious than the conduct alleged in *Furino* and *Bambi*. Servicer twice requested additional documents (two paystubs and a hardship letter and, later, a W2 form) from Debtor and those documents were twice provided. Approximately three weeks later counsel to Servicer sent an email asking if all of the loss mitigation documents had been submitted and the Debtor replied that they had. Approximately two and a half weeks later Servicer sent the Debtor a letter denying his request for loss mitigation. In total, just over two months elapsed between the Debtor's initial request for loss mitigation on April 4, 2014 and Servicer's denial of same on June 9, 2014. Moreover, whereas the *Furino* mortgage holder repeatedly failed to appear in court and was continually nonresponsive, thus causing over a year of delays, Servicer made two written requests, investigated the Debtor's loss mitigation options thoroughly, and provided the Debtor with a final answer on his loss mitigation request in just over two months. Servicer did not fail to appear in court nor was it unresponsive to the Debtor's communications.

Here the facts are also distinguishable from those of the *Bambi* case since the bank in *Bambi* repeatedly changed its policies, refused to inform the court about its policies even upon request, failed to timely obtain an appraisal, and refused to reduce to writing an agreement which resembled the terms of an oral agreement between the parties, resulting in over a year and a half of delays. Servicer, on the other hand, did not attempt to deceive the Debtor, did not alter its policies midcourse, and appears to have communicated openly with the Debtor throughout the LMP process. While it is unfortunate that the USDA has a policy of denying the specific type of

loan modification request the Debtor desired, and perhaps it would have been better if Servicer communicated this policy immediately to allow the Debtor to decide whether to pursue the LMP process any further, it is clear to the court that Servicers did not act in bad faith in failing to disclose this policy at the outset. First, in his motion to enter into the LMP, the Debtor states his desire to "negotiate a deal where either all or a portion of the mortgage arrears are put on the back end of his loan obligation." *See,* Document 30 on the Court's Docket, ¶22. It is not clear from this statement alone that the Debtor desired this option only and counsel to the Debtor ultimately confirmed that the Debtor was open to any option that would help him stay in his home. The Debtor simply has not demonstrated that Servicers were aware that the Debtor was only amenable to a loan modification that deferred his arrears until the end of the loan term and that as such Servicers strung the Debtor along by not informing him that the relief he sought was unavailable to him at the outset.

Second, it is undisputed that Servicers explored other options. While the other options may have been unacceptable to the Debtor, this alone is not enough for a finding of bad faith. "Participation in the LMP does not require loan modification, it requires the parties to work toward an acceptable resolution whenever possible . . . ." *Furino,* 2014 WL 789116, at *3. Servicers used the additional documents they requested to investigate non-loan modification loss mitigation alternatives such as a short-term repayment or forbearance agreement and liquidation options such as a deed in lieu of foreclosure or a short sale. This conduct does not suggest Servicers working in bad faith but instead demonstrates Servicers were working to find a viable loss mitigation solution for the Debtor. While the Debtor was not happy with the results, a "[d]ebtor's unhappiness with [the mortgage holder's] proposal is not indicative of bad faith, in itself, nor does the duty to negotiate in good faith guarantee a positive outcome." *Id.*

Because the court concludes that the Debtor has not satisfied his burden that Servicers acted in bad faith and the record reflects that Servicers in fact participated in the LMP process in good faith, the Debtor's Motion for Sanctions will be denied. A form of Order accompanies this Opinion.

10/2/14